When you're ready, Counsel. Thank you, Your Honors. May it please the Court, Vasudha Tala, Counsel for the Appellant Plaintiffs. I'd like to reserve three minutes of my time for rebuttal if I may. Great. Thank you. This is the first case under the Privacy Act to consider whether an agency may lawfully maintain records about a journalist's First Amendment-protected activities. I'd like to spend the bulk of my time discussing the application of the proper balancing test under McPherson v. IRS, turn next to the proper construction of the word maintain under Section E-7, and then finally touch on the declaration submitted by the FBI in this case to meet its burden of proof. This Court in McPherson recognized the special relationship between the First Amendment and Section E-7 of the Privacy Act by adopting a narrow reading of the law enforcement activities exception and adopting a balancing test in which not only the factors for but the factors against the maintenance of a record of First Amendment activity must be considered on an individualized case-by-case basis. The District Court below committed at least two legal errors. First, the Court failed to apply the proper balancing test by failing to consider any factors against the maintenance of the two memos here. And second, the Court did not adopt a narrow reading of the law enforcement activity exception but instead adopted a broad reading, adopting in essence and applying a legal relevancy rule coming from other circuits that the McPherson Court explicitly considered and rejected. I'd like to turn to application of the proper balancing test to the April 30, 2004 memo. At minimum, a balancing test properly applied here would have considered the following factors. First, that the plaintiffs were engaged in the heart of activity that is protected by the First Amendment. That is republication of information that is widely circulated on matters of public concern and over which there is no concern of how the journalists obtain that information. Second, that the FBI itself in a July 2004 memo recognized that the plaintiff's court in the April 30 memo was nothing more than the exercise of their constitutional rights to free speech. And in that same July 2004 memo recognized that the plaintiffs posed no risk to national security, had no connection to terrorism, and that the information that they were publishing was merely public source information. A balancing test would have also considered the fact that the scope of records that were collected in the April 30, 2004 memo was wildly overbroad. It reflected plaintiff's views on a number of topics beyond the posting of simply the so-called finish list on topics such as World War II. Let me ask you this. We've all read the, I'll call it the memo, the April 30 memo. How far does your argument go? Is the FBI forbidden to compile this information as it posed by either of these two individuals? We're not arguing that. What we are arguing is that in this situation where the threat, so-called threat assessment, was focused solely and triggered solely by plaintiff's First Amendment activities at the point at which the FBI in July 2004 concluded that they were simply exercising their rights to free speech and that there was no criminal conduct suspected, that is the moment they should have stopped maintaining those records. In the course of their investigation, are they allowed to write things down? Of course. And are you saying that, let's assume that they've investigated and learned all these things that are now in the memo. Were they forbidden to write all of these things down because all of these things taken as a whole would indicate that this was protected? Or can they write it down, look at it, and then say, you know what, there's not enough here to satisfy the exception and we therefore can't keep it? The latter. So they can write it all down and they can maintain it for at least long enough for them to make the determination whether they should retain it. Correct. And it's important to note two things. That first, we're talking about a so-called threat assessment, in which there is no predicate needed for... Can I follow up on that? I had thought that what you were saying earlier was they can look at it. I mean, you know, they can go look at this information, but they can't actually download the articles, for example, and put them on computers. Because once they do that, then you're into the second issue. The one about what does maintain the records mean, right? If they legitimately collected it, then the question becomes whether they legitimately continue to maintain it as opposed to maintain it long enough to make the decision. Is that right? So in other words, you have to prevail on your temporal point if the way you described the statute to Judge Fletcher is correct. Is that not right? So we want to make the point that there is the maintenance issue as of July 2004, and there is the maintenance issue today. So even if the court was to find that the FBI was authorized to quote-unquote maintain in July 2004, they can't justify the ongoing maintenance today. So we're making the argument about both temporal points, both in July 2004 as well as today. But you are taking the position that they can collect the material, put it in a file until they decide that there's nothing there, and then they have to get rid of it. So I want to be clear that in certain circumstances, the FBI may be engaged in authorized law enforcement activity, and we're not seeking to constrain the FBI in those types of situations. We do also have the point here that the FBI was not engaged in authorized law enforcement activity at the time they first initiated the threat assessment. So I just want to clarify this. We're not seeking to constrain the FBI from engaging. Wait a minute. Why weren't they engaged in, you know, I mean, investigating is very different from, of course, prosecuting. And things may, I'm now just talking about an ordinary policeman. Ordinary policemen see something that in his or her mind is suspicious, doesn't do anything like arrest anybody, doesn't do anything that's sort of infringing on somebody's freedom, looks around, in the end says, you know, there's nothing here. But that doesn't make the investigation of looking around wrong. So what's wrong about the investigation here, or was there anything wrong about the investigation? Turns out there's nothing wrong. It's all First Amendment stuff. There's no national security threat, as the San Francisco office concludes. But was there something wrong in the investigation here? Yes. What was it? And that's because that's because we are talking about a threat assessment as opposed to a preliminary investigation or a full investigation. The hypothetical that Judge Fletcher, you just posed, would presumably fall within the preliminary investigation or full investigation, because those are based on suspicion of some sort of criminal. You're using the analogy of a policeman on the beat. Correct. So a threat assessment under the FBI's guidelines can be predicated on really no suspicion at all. But what it cannot be under the FBI's own guidelines in 2003 is predicated solely based on First Amendment activities. And when the FBI started its threat assessment of antiwar.com, it was based solely on the plaintiff's posting of the so-called finish list and yet another list activity that was totally protected by the First Amendment. So what our argument is that under the FBI's own 2003 guidelines, it was not authorized to undertake this particular threat assessment. Now, this is a different question. I think it may be irrelevant in the long run. I'm on ER 270 entry number eight, or maybe it's nine. I think, I guess, no, they're all eight. They're crossed out, so it's hard to read. It says on the Pravada website was posted an article. Is that Pravda? I'm sorry, what number? I'm in the middle of the page. They all seem to be the same. Or maybe it's S. It's all crossed out. It's the middle of the page. On the Pravada website was posted an article by Justin Raimondo. Is that Pravda? I actually do not know. I looked. I tried to find something called Pravada, and I couldn't. My guess is it's Pravda, but I don't know. Okay. Correct. I'm really confused now about your position. I thought earlier you said there was nothing wrong with this investigation. The problem was that they kept the material once they realized that there was nothing in it. And now you're saying that the whole, that from the outset, there was the investigation, not just the collection and maintenance of the because it was based on First Amendment activity only. So I'm really confused. I apologize, Your Honor. So let me try to clarify. We are making two arguments. First, that under McPherson, there is a requirement that agencies show authorized law enforcement activity and that the agency did not do that because the threat assessment was predicated solely on First Amendment related conduct. But even if an agency can show authorized law enforcement activity, McPherson requires more, requires a balancing test in which for the investigation or for the retention? For the retention, for the retention. And that's because McPherson is very clear that both the factors for and against the maintenance must be considered on an individualized case-by-case basis. And under that balancing test, the conclusion in July 2004 that they were ultimately not, the plaintiffs were not engaged in any criminal conduct, no direct nexus to terrorism, and no national security threat carries more weight, even if this court were to find that the threat assessment were authorized. Just to continue. And authorized in your view, and this is another thing I don't, my understanding of the government's position is that authorized law enforcement activity refers to their own internal guidelines and guidances. And that, and you're essentially saying that there are external rules, including the Constitution, which makes some sense, as to whether it's authorized. Well, the same 2003 guidelines that the government relies on to say this is a threat assessment under those guidelines, page seven of those guidelines also prohibits FBI activity that is solely predicated on First Amendment activities. So under those same guidelines, they are not, it was not an authorized threat assessment. Presumably, though, I mean, in this instance, there was this list that, as I understand it, that purported to be internal governmental documents. And it took at least some investigation to discover that they were actually already in public domain. So when it, it wasn't transparently obvious that there was totally First Amendment activity at the beginning. Even if this court were to accept that there was some justification to conduct a threat assessment of some limited scope to find out more about this so-called finish list, we have the issue of scope, of course, right? Within section E-7, this word scope appears, and footnote nine in McPherson instructs that scope continues to be a relevant issue when assessing the law enforcement activity exception. And with respect to scope, the amount of plaintiff's First Amendment activity that was recorded in the April 30th, 2004 memo is wildly overbroad. It really does, and we can see that most clearly by looking. Is it necessary to your argument under the Privacy Act that the investigation have been improper? Is it, or is it necessary only that the preservation of the is, is improper? So it is not necessary for us to win to show that the law enforcement activity was not authorized because we still have the balancing test where that is simply one factor among many. And I just would like to draw the court's attention to an August 2004 memo prepared by a different field office that was looking at the same so-called finish list on the plaintiff's but was much narrower in scope. And that's, I believe, at ER 280. And in that memo, the FBI collected only the plaintiff's article in which that list was linked, and two other articles which showed that it was actually the Finnish financial authority that had released this list in the first instance. And so that is a much more narrowly scoped memo than what we find here. Assuming for a moment that Pravda is Pravda, is there anything there that would justify an investigation further as to any possible links between the two journalists here and Pravda? I understand what it says is that it was on the Pravda website, and Pravda can pick up anything it wants and put there. I get that. But assuming that it's Pravda, is there anything there that would justify an investigation based on national security? That is certainly not what the government has come forward to assert. The government in its papers has only ever asserted that it's the two lists linked on the plaintiff's website. So that is not the government's position. If I may, I would just like to turn for a moment to the maintenance issue and say that the rule we are asking for is that the word maintain must be given, or rather the definition maintain within Section E-7 must be given a meaning separate from the definition collect in order for that term not to be superfluous. Wait, where is the word collect in the statute? Sure. So in subsection A-3 of the Privacy Act, that's the definitional terms for the Privacy Act, A-3 defines the term includes maintain, collect, use, or disseminate. And both... I'm sorry, can you tell me the subsection again? Subsection A-3. E-3 or A-3? I'm sorry, A-3, A-3. Yeah, 552A. We're talking about E-7, are we not? So Section E-7 uses the phrase, the agency shall not, or the agency... maintains the system of records, and then Section E-7 says, maintain no record describing how any individual exercises rights guaranteed by the First Amendment. But the key question really isn't what maintain means. We know that maintain, well, first of all, is defined to include collect, but it's also defined to include maintain, and maintain means still have it. So, but the question is really whether what it says by the individual... less pertinent to and within the scope of an authorized law enforcement activity, that means a current one or a past one. That's the key question, right? Whether unless pertinent to maintain something pertinent to and within the scope of an authorized law enforcement activity, you know, could be read to mean one that's temporally co-existent. I gather the government's reading is that, and the reading of the other two circuits is that, it doesn't mean that it includes a past one. But it doesn't really have to do with what maintain means, does it? So, one approach is to look at the exception and try to determine whether it modifies the word record or modifies the word maintain. Our position is that has to modify the word maintain because the prior two exceptions within E-7 clearly modify the word maintain. Right. And so then, once you, once it's the main... When you talk about an authorized law enforcement activity, does that mean one that's going on at the time you're maintaining it? So, the two positions that have been taken are that either it's only required that the agency have the authorized law enforcement activity at the time the record is initially collected, but, and subsequently needs to show no further justification for the ongoing maintenance of the record. But if that were true, then the definition maintain really plays no function in the statute. If it's only the collection that needs to be relevant to and, I'm sorry, pertinent to and within the scope of an authorized law enforcement activity, then the... Sorry, I'm not seeing that. Sure. So, one... All right. It just has to be true that maintain is different than collect. Correct. And maintain means keep it now in 2019. Right? So, that's fine. But pertinent to and within the scope of an authorized law enforcement activity can mean an authorized... Does it mean an authorized law enforcement activity ever or an authorized law enforcement activity now? So, it has to mean now to match the temporal timeframe of maintain. If it's only at the time, sometime past, then it's not clear what the word maintain does separate from... I'm not sure if the... If that's a textual argument, I don't understand it. It makes perfect sense to me as I read this. I'm now looking at E7. Maintain a record unless the record is pertinent to and within the scope of an authorized law enforcement activity. I see nothing in there that says that it has to be an ongoing law enforcement activity. I see nothing in the text that requires the reading that you're arguing for. So, I do want to be clear about one point. We're not arguing that the FBI needs to show that the initial law enforcement activity that existed at the time the record was created is what continues today, nor that they're engaged in open, active investigation today, just that they can show some current need for the document today. I see nothing in the... I understand what you want, but I see nothing in the text that requires that. Our position is that the word maintain has to be read in conjunction with the authorized law enforcement activity and... Well, but authorized law enforcement activity does not say current or ongoing. It just says authorized. I... And it was authorized. That's consistent with the text. Further, the entire impetus of the statute was, as described in various ways, but the centerpiece is that the government is forbidden from maintaining a record of innocent First Amendment activity just on the off chance that it might become relevant at some later time. That carries with it an assumption that, well, if it's a non-protected First Amendment, you can maintain it just in case it becomes relevant at a later time. So it seems to me that not only do you have textual problems getting where you want to get, the history of the statute suggests you're wrong on this. I would respectfully disagree. I think the legislative history, as Judge Tatel runs through in his dissent in MacArthur Foundation case, as well as the D.C. Circuit and the Albright case, talk about maintenance and collection as two distinct harms. And if it was sufficient for the government to only have the authorized law enforcement activity at the time of collection, again, it's unclear why they would have created the separate definition and used that definition in Section E-7, what it would address or what sort of ongoing government activity it would address. I mean, I see the definitional section that says maintain includes not only maintain but collect. But as used in 7, it says maintain no record, which suggests to me that they're talking with the ordinary usage of maintain because they're not saying collect no record, they're saying maintain no record. I mean, it seems to me they're using it in a narrower sense that's permissible under the definition. I understand Your Honor's reading and we respectfully disagree. Again, this point, we contend that the proper reading of the statute is, of course, that they need to show a current law enforcement activity. But even if the Court were to disagree with us, under the McPherson balancing test, we think the other factors have more significant weight. I'm over time. Okay, thank you. We've taken you well over, but we'll give you a chance to respond. Before you begin, Mr. Yellen, the last time I saw you was here in Anchorage 14 years ago. Welcome back to Anchorage. Thank you very much, sir. May it please the Court, Louis Yellen from the Department of Justice here on behalf of the FBI. Your Honors, I'd like to address first, I think the most critical claim that plaintiffs are making here, namely that the threat assessment was not undertaken for a lawfully authorized investigation, or excuse me, an authorized investigation. Your Honors, the 2003 Attorney General standards permit the FBI to undertake threat assessments. That's the lowest level of inquiry. It does not permit surveillance, does not permit warrants. It was a proactive measure that the Attorney General authorized in response. Is that dispositive? I don't know how it plays out here, but it must, suppose the Department of Justice, which is not far-fetched in terms of where this all came from, authorized surveillance and recording of all anti-Vietnam speeches, or all speeches at Vietnam protests and all people who are at Vietnam protests, because something might eventuate. Is this statute completely agnostic as to if they decided to open threat assessments on that basis, it would be fine in terms of retaining those records? No, Your Honor, there would be a serious constitutional question whether or not the FBI could undertake surveillance for purely first amended. In terms of the statute, whether it's authorized or not, would it include some constitutional inquiry as well as an inquiry into what was authorized according to DOJ policy? I think, excuse me, I think authorized means lawfully authorized. And I think that this does not require only that DOJ policies be followed, but that the That's my understanding of her argument. I understand, Your Honor, and that's exactly that it was not constitutionally authorized. With respect, Your Honor, on the contrary, I do not believe anywhere plaintiffs have argued that the investigation was not constitutional. When she says that it was triggered only by First Amendment activity, isn't she saying that it wasn't constitutionally appropriate? They do not make an argument that the threat assessment was in violation of the Constitution. As I understand a plaintiff's argument, and they can clarify, of course, in their rebuttal, their argument is that the balance, given the First Amendment interests that are at issue here, tends in their favor. They do not make a First Amendment challenge to the investigation. But I'd like to emphasize, Your Honor. I beg your pardon, Your Honor. I heard such an argument a moment ago. If you did, Your Honor, I'd say it's not anywhere in the briefs, and there's not a challenge. Yes, I didn't see it clearly in the brief, but I certainly heard the argument a moment ago. That escaped my attention, and if it is made, I would refute it and point out, I think, at a threshold, Your Honor, whether or not that's an important issue in a future case, that's clearly not an issue here. This threat assessment was undertaken two and a half years after the largest terrorist attack on American soil. The threat assessment itself indicates an interest in understanding who these individuals were who published highly sensitive information on their own website. Granted, highly sensitive, but already in the public domain. Absolutely, Your Honor. And legitimately in the public domain. That is to say, my understanding is that this information is available, deliberately made available, so that certain people can use it to check on people. No, that's not correct, Your Honor. The initial disclosure was, there's nothing in the record that suggests that the FBI authorized disclosure of this information. It is available. Perhaps what Your Honor is considering is the second document that was issued, the suspect list, which there is some reference that agencies rely on that suspect list. The second list. The first list is a no. That was never authorized for disclosure. It was highly sensitive. And I want to step back and say, posting the list, both lists, was protected First Amendment activity. We are not challenging that. The only question is whether the FBI was permitted to undertake a threat assessment of the individuals and the website that did post. Then you are agreeing with her basic point, which is that the trigger for this investigation and for the collection was protected First Amendment activity. No, Your Honor. The question, Your Honor, is you can have protected First Amendment activity. The question is whether that was the only motivation, the only reason that FBI undertook the inquiry. Well, it was the only input data that led to the investigation. Can you define for me what exactly what a threat assessment is and how far it goes? I mean, how far? Yes, Your Honor. How wide a scope of activity it authorizes? Yes, Your Honor. I'll give a quick overview. But the place in the record that's most of the excerpts of record, that's the AG guidelines that describe the differences between a threat assessment, a preliminary investigation, and a full investigation. In a nutshell, Your Honor, the basic idea is that the FBI can proactively undertake initial inquiries relying on noninvasive techniques like looking at public records to determine whether an individual or an entity might be of investigative interest, might be of investigative interest. Now, here, Judge Berzon, I'd like to say that there does not need to be a trigger. But if there did need to be one, there was one in this case. It's not just that there was a posting here. There was a page 264 of the excerpts of record. There was a notification from the Counterterrorism Division notifying FBI offices that these lists were posted, that it's of concern to the FBI, and that it might contain information that could interfere with ongoing investigative concerns of the FBI. On page 264 of the record, You said that at the point they were doing this, they knew that wasn't the case. Well, they knew that the information was already available, and you said that that was protected first from an activity to posting it. Your Honor, one can post – I don't dispute that I said that, Your Honor. One can post information that is First Amendment-protected activity, but that could still indicate that the person who posted the information could be of possible investigative interest. But that does mean that the trigger was – you're telling me that there was something else besides this information, but there wasn't anything else. Because the only thing you have is a – you say that there was a memo from some other part of the government to the FBI saying that this could be a problem, but you're also saying that posting it was not a legitimate thing to be investigating. No, I'm not saying that at all, Your Honor. The last thing that you said – Posting it? All right. The reasons why an individual would choose to – let me give a hypothetical that I want to be very careful to say is miles apart from the facts of this case. I'm just using this for illustrative purposes. A terrorist can post information that is First Amendment-protected activity. The FBI could undertake an initial threat assessment and find out, oh, gosh, the reason why this individual posted this information is extraordinarily nefarious, and that we do have reason to undertake a preliminary investigation. The fact that the – But isn't the point of this – this is what's difficult here. The point of this statute is, as I understand it, really not to regulate the investigation, but to say, okay, but now that you've done that and discovered there was nothing in it, you shouldn't be keeping the records. So this gets to the point that – of the colloquy, I think, principally between Judge Fletcher and opposing counsel. The statute permits the maintenance of records if the D.C. and the Seventh Circuit have held there's nothing in the statute that – I understand that, but this is kind of at the front end in the sense that you – here the suspicion was dissipated very quickly, right, that there was nothing in it. The San Francisco office said nothing in it. It's protected activity. And your position is, nonetheless, you can keep those records for the next umpteenth – you know, through infinity, even though from the outset, not 10 years later, you understood that it was actually not anything but protected First Amendment activity. That's quite right, Your Honor, because the record itself of the investigation um, is – was collected, was – and maintained pursuant to an authorized law enforcement activity. Let me make sure. I think I'm understanding the argument, but let me read it back to you, and then you can say whether I've understood your argument correctly. As I'm understanding your argument is, if the investigation initially was a permitted investigation, irrespective of what it finds, it may be maintained, even though, for example, it finds only perfectly innocent, altogether First Amendment-protected activity. If the investigation was proper, whatever you find, you can keep. Is that right? Is that what you're saying? I'd like to answer and then give a brief explanation. The answer is yes. Well, that's broad. The explanation – I don't think that's the purpose of the statute. Maybe that's the reading of the statute. It's permissible, but I don't think that's the purpose at all. So two things. First, I might – if I might give some background, and then I'd like to give an elaboration on my yes. The background is this. There's legislative history which directly speaks to this that's discussed at length in the D.C. Circuit's MacArthur Foundation case. Most – I'm not sure the plaintiffs have relied on it here, but this Court – and I'm sorry – that legislative history suggested that it would never be appropriate for the FBI, for the government, to maintain information that's purely First Amendment-protected activity. Subsequently, the statute, the bill, was amended to add the law enforcement activity exception. And as the D.C. Circuit explained, this exception indicated that there can be innocent  The – this Court, in McPherson, recognized that the incidental collection of protected – of information about protected First Amendment activity is permissible under the statute. Now – Right. Although the footnote at the end said, on the other hand, if this information collected about the sort of the tax protest movement and conventions and so on were protected under the name of the individual, that's a different question. So – And, Your Honor, there's – McPherson holding is actually quite narrow. Um, I – I disagree with that, Your Honor, but if I might, here, there is no evidence in this record, although plaintiffs say to the contrary, there's no evidence in this record that there's any individual file on the plaintiffs or their website. I understand that, too. But the investigation in the McPherson case was basically this sort of – all these tax evasion schemes of, you know, we – I've seen – I've seen I don't know how many cases over the years of these sovereign nation ideas. I mean, there's just all kinds of crackpots out there that are clearly violating IRS regulations. They're doing that kind of a general investigation. Here, this is a targeted investigation of two people acting as, I have to say, kind of fringy, but fringy journalists, and it's specifically targeting them. The only thing it's targeting is First Amendment protected activity. So – so, Your Honor, this – this threat assessment isn't information about a knitting club. And – and is – this threat assessment was not an assessment about a knitting club engaging in freedom of association. This investigation was about individuals who – who published sensitive information protected by the First Amendment. But I'd like to point out also – What was collected had nothing to do with that. I mean, it was these articles about completely different things. Your Honor, McPherson recognized that it's important for the government to be able to collect information to give the full context of the – the activity that's being – What would – to back up, what would this statute therefore not allow? Here – I mean, we know the concerns were things like J. Edgar Hoover investigating Martin Luther King, right? Suppose J. Edgar Hoover decided to investigate Martin Luther King because he – for a threat assessment, because he thought that maybe there was some connection to, you know, the people who wanted to overthrow the government, which is what he thought. And he then collected everything that Martin Luther King ever said. And that would all be fine. He could keep it forever. No – no, I want to be very clear here, Your Honor. The AG guidelines were instituted in part to protect First Amendment interests. The AG guidelines, unlike the techniques that existed – And you backed up and you said the fact that it was – that the trigger was a First Amendment activity doesn't matter. And the fact that it turned out to be meritless very quickly doesn't matter. Your Honor, may I be – To use – take my hypothetical, you know, assuming good faith as to a concern about Martin Luther King being connected to people who were wanting to overthrow the government, and an incredibly broad scope investigation at the outset where every speech he ever gave was put in the FBI files and kept forever, I don't understand how that is distinguished from what you're saying here. Your Honor, assuming good faith and assuming that it was otherwise lawfully authorized, the answer would be that it wouldn't be otherwise. I think that there are – I want to be – take a step back. These hypotheticals that the Court is concerned about, I think it's perfectly fine to reserve those sorts of more difficult questions. But I'd like to point to two things in this record that are quite critical. If the Court looks at page 263 of the ER, the Court will see a reference to other files that this threat assessment was undertaken specifically in relation to IT Pakistan, IT UBL slash Al-Qaeda. That was the context in which this threat assessment was undertaken. At page 267 of the ER, the threat assessment identified a special agent had computer hard drives seized during the – I beg your pardon, sir. You referred me to ER 263. What's on that page that's relevant? If you look just above the black redacted material, you'll see something that says titles. Yeah. IT Pakistan, IT UBL slash Al-Qaeda. And what am I supposed to infer from that? That the threat assessment here was undertaken in relation to other concerns about the terrorist attacks that occurred in the United States and that – which connected to the 9-11 watch list. That is on the face of the assessment itself. But what triggers this is having – there's nothing to do with Al-Qaeda or Pakistan. What triggers it is the publication of a list that's in the public domain. With respect, Your Honor – I mean, they can put on this murder of Martin Luther King. But what triggers the investigation has nothing to do with the murder of Martin Luther King. So two points, Your Honor. First of all – I understand why the government is jumpy at this stage. I get that entirely. But – and that may be the heading in which they put that because the government is casting a very wide net. I get that too.  Your Honor, there's nothing in the statute that imposes a temporal limitation on maintenance of – Even – in other words, your temporal investigation – your temporal argument includes the initial decision – I mean, I don't know how this works at the FBI. But I presume there is some way in which these records enter into a filing system and – which is kept infinitely. And you say that even if the original investigation is negative, there is no responsibility to get rid of it at that point. Not 10 years later, but at that point. Your Honor, may I say that this Court, to the extent it has concerns of this sort, should reserve that question for a case that presents the issue. The Seventh Circuit in Bassuini recognized that if there is a reasonable prospect that the information that has been retained could be pertinent to future – behind this and nothing but First Amendment activity, what is the reasonable prospect other than maybe someday we'll – these people will show up again? That's not correct, Your Honor. The second page I was going to point your Honors to is page 267 of the ER. Hold on. I need to get there. I want to be with you. Yes, Your Honor. Okay. I'm on page 267. In the spillover paragraph beginning in the first full sentence – I beg your pardon. It's the first – you see where the first classification marking is crossed out, file 174A, and it follows? This is a little bit difficult to navigate. So I'm on page ER 267. How far down the page am I? At the very top of the page, the first full paragraph. It begins file 174A. Okay. I'm with you. Okay. Okay. I'm going past all the numbers. A special agent reviewed the computer hard drive seized during the investigation of Redacted. The review of two hard drives revealed visits to many websites between dates. One of the websites listed was antiwar.com. Now, I want to be clear. This does not suggest anything huge in itself. But it – I can't see what it suggests at all. Your Honor, what it suggests was somebody under investigation for – of whose hard which had to have been pursuant to a warrant, had viewed this particular website. So a bad guy visits this website, and that's enough to say that this is not First Amendment protected? No, Your Honor. No, no, no. This is critical, and I want to be very clear. Of course it's First Amendment-protected activity. McPherson recognized that the government may – under E7 may collect incidental information that relates to First Amendment-protected activity. The question is whether or not the maintenance of the record is appropriate and permissible under E7, even though the activity that's documented is undoubtedly First Amendment-protected activity. Under Bassowini, the Seventh Circuit's – If you take this paragraph in isolation and you put it with the file of whoever – whosever name is redacted, I'm fine with that. But to have it in a file that's for these people, that strikes me as wrong. There is no file for these people, Your Honor. That's simply not reflected in this record. But to put it in a document that's solely dedicated to these people strikes me as wrong. I understand this paragraph. If it tells me something about the guy whose name or woman whose name is redacted, who you're telling me is someone that there is a legitimate investigation for, I'll take that as assumed. Well, okay, that paragraph, put it in the file with that guy. But I see nothing here that inculpates to the least degree either of the two plaintiffs in this case. It does not, Your Honor. And I'd like to make, if I might, two points in response to that. The first, this Court and many other courts of appeals have recognized in the national security context what's called the mosaic theory. Individual pieces of information in isolation might not seem probative, but together and in retrospect – I'm saying you can keep this. You just can't – Your Honor, this is a piece of information that was collected in the context of other pieces of information. But you want this to authorize to keep not only this, but to keep all this other stuff, including the articles they wrote about things that have nothing to do with this. The attachments, you mean, Your Honor. Yes, Your Honor, because, again, this Court and other courts have recognized that single pieces of information in isolation might be completely – So this gets to the second point. Under the statute, the clear language of the statute, the collection and the maintenance has to be pursuant to – within the scope and pertinent to an authorized law enforcement activity. That authorization has to be permitted by regulation, statute, and the Constitution, or it's not permitted. The AG guidelines have very specific limits about First Amendment-protected activity. If the investigation did not have a connection to national security matters, it could not have been undertaken. But it turns out it had no connection to – With respect, Your Honor, the plaintiff's conduct here was protected. That does not mean that the information that was collected during the threat assessment is unrelated to law enforcement activity. It isn't either, and it isn't. That's not correct, Your Honor. With respect, it was authorized by the threat assessment. Authorized, but that goes back to the other question. If you had a rule, as where I began before, if you had authorized the collection of every speech given by everybody in the Black Lives Matter movement in Justice Department – there was a Justice Department authorization of that, that wouldn't be good enough, would it? Your Honor, that hypothetical I suspect there would be many legal problems with. Okay. That is – But it can't – the answer can't be that there's a piece of paper in the Justice Department that says it's okay to do this. Your Honor, it's not just the Justice Department say so. As I said, it's regulations, statute, and the Constitution. The hypotheticals that Your Honor is giving, I could understand the concern, and the Court should reserve any questions like that because we are miles away. Where the line is between my hypotheticals and this? The hypothetical that you just gave would raise serious constitutional questions. Collecting information about – if I understood the hypothetical correctly, under – But here they collected information about articles that these people wrote and triggered by concededly First Amendment-protected activity and kept it, correct? And that's identical to McPherson. McPherson engaged in purely protected First Amendment activity. This Court in McPherson said, by public – by speaking on issues that were extremely sensitive and approached violations, protected activity that approached violations of criminal law, Mr. McPherson had to have known that there would be investigative interest. Similarly here, the publication, even if protected by the Constitution, of highly sensitive, terrorism-related documents, plaintiffs had to know that there would be some investigative interest by the law enforcement entity charged with protecting the United States and its people against terrorist attacks. This all goes back to your argument that if the investigation itself is legitimate, the results of the investigation may be maintained even if everything discovered is First Amendment-protected activity. That's your position, correct? That is our position, Your Honor. I want to be very clear that the Court doesn't have to accept that full principle. Basuini, I think, give – the Court can reserve that question. Your description right now, which we endorse, is the D.C. Circuit standard. But you say the Court doesn't have to accept that, I think you said, full position. How far does the acceptance have to go? I suggest, as we did in the brief, that the Court could adopt the Seventh Circuit standard here, reserving the broader question. The Seventh Circuit standard asked whether it was a reasonable prospect that the information retained could have some bearing on other law enforcement activity. Here, the provisions of the 2004 memo, the paragraphs that we discussed, indicate connections to other — And the file names that we discussed. That's just a heading. That's not a paragraph. There's no information contained there except a heading. No, that's right, Your Honor. But it shows – with respect, Your Honor, it is not this Court's role to second-guess. Well, maybe my objection is just you called it a paragraph. It's a heading. I beg your pardon, Your Honor. I didn't mean to suggest that it was more substantive than it is. But I'd like to be clear. This Court has an absolute obligation to protect First Amendment rights of citizens. That obligation, however, does not entail second-guessing legitimate law enforcement activity of the FBI, which includes maintaining records that could be useful to future investigations, especially in the context of documents such as this that are hugely sensitive, that, again, that implicate — Documents that are hugely sensitive. Now, which documents are you now — I'm talking about the possible 9-11 watch list and the suspect list that were published. But the only connection is that these documents were in the public domain. Pursuant to their First Amendment rights, they were republished by these people. So they're highly sensitive documents. But the only activity that you're talking about is First Amendment protected. That doesn't mean that the FBI can't have a legitimate interest in understanding the reasons for the publication and whether or not the individuals who made the publication are potentially a threat and potentially of investigative interest. My problem with the operation of the statute as you would have it, which is to say that I'm reluctant to curtail the investigative activity that is here pretty nonintrusive. But I'm also reluctant to say that once the government has discovered nothing but First Amendment protected activity, that they're allowed to keep it without — because I don't read the statute as allowing them to keep it. Once they've discovered nothing that is inculpating and everything is First Amendment protected, I just can't have trouble reading the statute that way. I think — I'm sorry, Your Honor, but I see nothing in the text or the legislative history of the statute that directs the government to purge its documents once it has collected — But just to add a caveat to that. At least absent some articulable, plausible reason to think that there is a future law enforcement reason to keep this, which is essentially the Seventh Circuit standard. Agreed, Your Honor. And where is that here? Your Honor, on its face, the paragraphs — I would propose that the Court — or suggest I know the Court has and will — you read the 2004 document. It contains a lot of information. Several times. And it is not — with respect, Your Honor, with deep respect, it is not the Court's role to second-guess the FBI's assessment that information in this document could be pertinent — could be pertinent. All right. So that's — your ultimate bottom line is that we don't have a role in deciding whether or not there is any plausible connection articulated by the FBI, either in the documents or in depositions or declarations or something in the record here, that there is a legitimate connection to some continuing activity. You're saying we have no role? No. This Court has to — has to police the outer bounds. If this were — to take another absurd hypothetical, if this were information about a knitting club that had no connection to national security and that — Oh, have you read Tale of Two Cities? I beg your pardon? Have you read Tale of Two Cities? I have, Your Honor. Okay. Knitting club, bad example. You haven't done one? Fair enough, Your Honor. Let's take any other club that is engaging in free association rights. This Court has to ensure that the FBI — the government, in any case — has articulated a plausible explanation for why — for why it is reasonably anticipated — What is the plausible explanation here? Your Honor, I would say that the Campey Declaration and the memo itself indicate that the information collected in this document, including the attachments, relate to national security concerns such as terrorism and that the court — If we don't see that, then you lose. I mean, we have some role in determining whether that's true. If you don't see that, Your Honor, then the court will have to undertake the harder question about whether or not the D.C. Circuit is correct, that once the information was collected pursuant to a legitimate law enforcement activity, it cannot be maintained. And with respect, there's nothing in the statute that would authorize that. It would, as Judge Fletcher suggested before, read into the statute the terms ongoing or current, which does not exist there. The legislative history of the statute does not support it. The purpose of this provision of the Privacy Act does not support it. And, Your Honor, if the court were to reach that question and decide contrary, we would have a conflict with the D.C. Circuit. And that court, of course — You're allowing it anyway because of the Seventh Circuit. No, Your Honor. I don't think that there is a conflict. I don't think the Seventh Circuit said this is the only circumstance. I think the court said when these conditions are satisfied, this is sufficient. And it found in that case that the conditions were satisfied. So, of course, this Court has to make its own independent judgment on this. But I would just point out that the D.C. Circuit deals with the vast majority of Privacy Act claims in the country. And — Can I come in? I beg your pardon? I mean, that's the whole — well, forget it. No, Your Honor. I didn't mean — If you make it up the set of the D.C. Circuit, it can be annoying here. It's — with respect, Your Honor, I only meant to say that it's persuasive precedent for the court to consider from a court that's expert in this. The court — I don't mean to suggest, of course, that that is any way controlling here. This Court makes its own judgment about that. I would just emphasize, Your Honors, that I want to be very clear. The thing that this Court should not do is second-guess whether or not information collected in the context of a national security terrorism investigation could be pertinent to future investigations. You could parse particular paragraphs and say, I don't see the relevance here, I don't see the relevance there. The Privacy Act is not a vehicle for redacting or for expunging particular paragraphs. This Court and other courts have recognized the mosaic theory under which particular pieces of information, while appearing completely innocent in one context, could, in the context of a future investigation, shine light on intelligence or national security matters. And the court's role is to determine that the FBI has acted consistent with the statute. We assert that it is, Your Honor. Thank you. Thank you, Your Honors. We took you well over time. Would you — let's put two minutes on the clock and see how far over we go. Thank you, Your Honor. I'd like to start by addressing the post-hoc justifications of why this memo was created. It's been a shifting target throughout litigation. And I would just point the Court to ER 59. This is the District Court's first summary judgment order. Footnote 11 notes that the FBI, during summary judgment, all of a sudden asserted for the first time that it was actually some sort of criminal conduct that warranted the scrutiny of antiwar.com, rather than the posting of these two lists. And the District Court there said that the FBI previously represented that the sole basis of the threat assessment was discovery of one or more lists, and that the FBI was precluded then from arguing that the plaintiffs, in fact, were being investigated for alleged criminal offenses. So the paragraphs from the April 30, 2004 memo that counsel just highlighted regarding Pakistan or al-Qaida or some other person viewing the plaintiff's website, that's simply not the basis that they have ever been allowed to rely on. So they shouldn't be allowed to come forward now and assert some post hoc justification of hypothetical law enforcement activity that may have triggered that. And that really goes to the heart of the issue, which is that this Court of McPherson undertook a very narrow reading of that exception and noted that the addition of that exception at a late stage of the drafting of the Privacy Act was not intended to dilute the guarantees of the First Amendment. And so it rejected specifically the rule that counsel would advance here, which is that as soon as the agency asserts an authorized law enforcement activity, the record can be maintained. That is the rule from Clarkson or Jabara, which the McPherson Court specifically rejected and said, we don't want to adopt a hard and fast standard. We want to adopt a balancing test. I'd also like to point out that McPherson can be distinguished because that is a criminal tax evasion, admittedly. And here, of course, the plaintiffs were engaged in First Amendment-protected activity. There, McPherson's speeches were permitted to be maintained because they were a significant part of that tax evasion conference, while here that is not at all the case. I am out of time, but if there are other questions of the Court. Maybe no further questions. Thank you, Your Honors. Thank you both sides for very good arguments. Raimondo versus FBI, submitted for decision.
judges: Tashima, W. Fletcher, Berzon